The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. The first case for argument this morning is 20-1937 Becton, Dickinson and Company v. Baxter Corporation. Mr. Saunders, whenever you're ready. Good morning, and may it please the Court. The board ruled for us on motivation to combine and almost every element in Baxter's claims. But erred in addressing two of the limitations. First, on claim one, it was upheld based solely on the highlighting limitation, which involves nothing more than clicking on a touchscreen to get more information about a step in the drug preparation process. And there, the board erred under KSR by seeking out precise teachings from one reference rather than considering the originality disclosed in Liff and Morrison to the drug recipe that the board found would be displayed in the combined system. And then on claim eight, the board additionally relied on the verification limitation. And there, we think the basis of the board's ruling is not clear, but even with further explanation, Alexander's teaching that a remote pharmacist may verify each step as it is performed leaves no room to distinguish Baxter's claim. And the two arguments that were summarized by the board were both legally flawed. One's relying on a distinction that even Baxter is not trying to defend on appeal, and the other is relying on expert testimony that did not even address the relevant disclosure in Baxter. So, you know, to continue on with the verification limitation... Can you call Mr. Saunders what you said the first thing, which is that they're not even defending one of the reliance points by the board? Was that a may versus shall, or is that a different one? Yes. No, it's the may versus must. And this was a big motivation for making the failure to explain argument, because I was in the summary of the party's position, and it's not clear to us whether the board is relying on that because of the way it just summarized the party's positions and then had a conclusory statement rather than giving its own reasons. And we think that that is a problematic distinction here, because the may that you see is just the classic introduction to one of the embodiments in Alexander itself. And as we've talked about in this court's Hewlett-Packard case, you know, a disclosure in the prior art that sometimes, but not always, embodies the claimed method nonetheless teaches that aspect. What can you point us to in the spec in Alexander? I mean, the board construed the verification limitation as requiring an affirmative click trigger to verify each step before continuing to the next. And where is that in Alexander? Well, I, the board didn't specifically require a click-through verification. The board said that there has to be verification before the operator can continue, and then it held that claims were agnostic about the source of the input for the verification. So, Mr. Saunders, doesn't the, doesn't Alexander disclose exactly that? It says in column 9, the pharmacist may verify each step is performed in the identification of the non-pharmacist, that the step was performed correctly. And then in a part of the abstract that you don't cite, the last sentence, it says specifically receiving the pharmacist's verification may authorize the non-pharmacist to further process the work. That seems to be exactly what this patent is talking about, isn't it? Yes, so we think Alexander's right in pointing, Judge. Like, that's exactly where, where I was headed is, the board wasn't specifically requiring click-through verification, but Alexander itself is disclosing a system and a method, and in the column 9 disclosure about verifying each step as it is performed, it talks about the pharmacist remotely verifying that work via, quote, a real-time collaboration tool, and it specifically says in that same embodiment that the remote pharmacist may provide the feedback via that same collaboration software or, or other methods. So we think that... Can you just make sure we're all on the same thing? Is this like column 9, lines 48 onward? Yes. Yes. It's not just column 9, it's the last sentence of the abstract, which says specifically receiving the pharmacist's verification may authorize the non-pharmacist to further process the work, which seems to me to suggest that he's not authorized to further process the work unless he receives the verification. Am I missing something? No, you're... Judge A, I'm certainly not going to fight you on that. I think that is correct, and I think that we had the testimony from our expert saying that this is exactly how these disclosures would be understood, and on the other side, you know, if you look at what the board is saying in its opinion on page 36 or 37, as it summarizes Baxter's argument that it ultimately seems to rely on, it cites the testimony of Dr. Britton, Baxter's expert, who's reading Alexander as a typical procedure for final verification, and what the board is then citing there is paragraph 70 to 72 of his declaration, and in those paragraphs, he talks about a different embodiment of Alexander, final verification. He says the premise of his opinion is, quote, this review and verification process happens at the end after the dose has been prepared. That's at Appendix 3007. That's paragraph 71 of their expert declaration, and nowhere in there does he discuss this column 9 embodiment about the verification in real time, and so the board's explanation here is based on his opinion that Alexander is just about final verification. He then says, you know, applying this logic and accordingly, so its conclusions, if that is what it's endorsing here, can't be defended because they're based on expert testimony that's not addressing the relevant provision of Alexander. And so that really is the heart of the problem with the Alexander argument. You know, we also have the highlighting limitation, and there, the board itself considered the issue to be a close case, but here we think it went astray and violated KSR because it was focusing too narrowly on the particular use of the highlighting in LIFF, rather than the combined teaching You know, LIFF and Morrison are being cited here for absolutely basic computer functionality, a touchscreen where you can enter information or highlight something to get additional information, and which to be clear, as you can see at the top of column 16 of the patent, when we talk about highlighting, that can be as simple as just clicking on the touchscreen to get additional information, and the Baxter's not challenged on appeal, the board's finding that a set of drug preparation steps would have been provided on the computer in the combined system, found motivation to combine, and so the error on the highlighting step was, it was focusing on precisely what is being highlighted in the LIFF or the Morrison references, and missing the point. It's a searching for that expressed teaching within the single reference and not recognizing that the argument was saying when you have the combined system and you have the drug preparation steps disclosed within the LIFF interface, all we're talking about is simply applying the navigation and data entry techniques that were already present in LIFF to those drug preparation steps, and so here it's as simple as tapping on a touchscreen but it would be the same logic as if we were citing LIFF for clicking with a mouse or using multiple tabs on the screen or using hyperlinks. It's about as straightforward a combination there as you can get, and you know, an issue I think that has come up in the briefing was this question of, well, what additional information are we talking about, and you know, I think the first thing I would say is that it's not a sustainable distinction because the 579 patent itself doesn't disclose that level of detail. It's just talking about the touchscreen. You can click on it. In that case, one of the embodiments just has a detail button. You can get sort of unspecified additional information, but you know, the backdrop here is that we're talking about going from a world, and this is laid out in our experts' testimony, where he talks about sort of what was available to the pharmacist before in terms of being able to look at the steps on the label, reference materials, things like that. So we're just talking about going from a world in which an operator who could have been following a recipe on paper might have turned to a reference book or the label itself for additional information. To a world in which an operator who's following that recipe on the screen just clicks, taps on the screen to get that additional information. And that is, you know, a very simple straightforward combination, and we think that the board was improperly analyzing it within the wrong legal framework. Mr. Saunders, before you wrap up, could I just, this is Judge Prowse, could I just ask you a basic housekeeping question? Which is, if we reverse only as to verification, all the claims remain invalid. This is a question. But if we, and if we reverse only on highlighting claims 1 through 7 and 22 would be invalid, but 18 and through 13 would survive. But obviously, if we reverse on both, you've got it all, right, Mike? Right. Don't quote me right on exactly the dependent claim numbers, but yes, you know, highlighting alone reversal is claim 1 and its dependent claims are invalid. But you also have to reach for us on verification to reach claim 8 and its dependent claims. Thank you. Um, I see I'm almost into my rebuttal time, so I think I will pause here and save the time for rebuttal. Okay. Thank you. Mr. Weed, whenever you're ready. May it please the court, Benjamin Weed on behalf of the Appalachian Baxter Corporation, Englewood. Your Honors, BD knows the issues it argues here are fact determinations for which the board... Mr. Weed, help me here. Paragraph 9 of our... Column 9 of Alexander says that the remote pharmacist can verify that the steps are being performed correctly and then advise the pharmacist whether that's true or not. The last sentence of the abstract is receiving the pharmacist's verification, they authorize the non-pharmacist to further process the work. Why isn't that exactly saying you can't process the work further to get the verification? Your Honor, I think this is an important time to realize that the board construed this claim limitation and BD has not appealed that construction. And in the board's construction, which can be found at appendix page 18, I'm sorry, 17, the board says we construe element 8J, which is an element of a system claim. As requiring that, quote, the system will not allow the operator to proceed to the next step until the prior step has been verified. Okay, but you're not answering my question. My question is doesn't Alexander disclose exactly that? That the remote pharmacist verifies, tells the processor that it's being performed correctly, and then the abstract says receiving the verification may authorize further processing. Your Honor, it's exactly the same thing. Respectfully, it's not the same thing because in the Alexander context, that was a reference where telephone calls were made between the pharmacist and the non-pharmacist. The only quote-unquote technology described in the Alexander patent is off-the-shelf computers and off-the-shelf digital cameras. There is no... You're just not answering my question. You are not answering my question. I want you to focus on the last sentence of the abstract and tell me why that isn't the same thing as your patent. Because the protocol described in that sentence in the abstract is a pharmacy protocol where the pharmacist is simply calling up the non-pharmacist and saying you've done it right, you can proceed. But the inventions in the 579 patent, and particularly on claim 8, are about having a system which prohibits, it's the hard stop concept, which prohibits a non-pharmacist from proceeding until verification has been received. Why isn't that the same thing as the last sentence of the abstract? It says may authorize him to proceed. The obvious implication of that is without the authorization, you can't proceed. The authorization that Alexander is talking about is an authorization received from the pharmacist. It's a safety consideration so that the pharmacist has eyes on everything the non-pharmacist is doing because ultimately it's the pharmacist's license on the line. I'm just not addressing what I'm asking about, which is that last sentence. Why does the last sentence say exactly that? You need an authorization to proceed. Obviously, if you don't get it, you can't proceed. That, I think, is the reason exactly, Your Honor. It is not true that if the non-pharmacist fails to receive an authorization, he or she can't proceed. He or she could proceed. It's a telephone-based system where the pharmacist is... He can proceed without authorization? Yes, absolutely. Absolutely. That's exactly what the 579 patent and the system claim in particular addresses. Now, we have a system where the non-pharmacist is prohibited from proceeding. This is the entire fight the parties had below about what was ultimately characterized as the hard stop limitation. It finds its way into the claim as a requirement because of the board's claim construction on Appendix 17. I think it's very important to remember that Claim 8 is an apparatus claim. It's a system claim, and one of the requirements, unappealed by BD in this case, is that the system itself must not allow the operator to proceed until the prior step has been verified. And that is where Alexander is deficient, and that is where there simply is no evidence that the change required would be obvious. I'd like to address briefly Mr. Saunders' points about the may-must argument because, frankly, I was a bit surprised to see that position in the reply brief. And if the panel would look at Appendix page 5281, which we cite in our brief at page 21 of Baxter's brief, this is part of the petition that was submitted. I'm sorry, the Patent Owner Response that was submitted below. And in that passage on the bottom of Appendix 5281, it's very clear that what Baxter is arguing is there is no system doing what the board ultimately construed it to do. That's on page 5281 of the appendix. On the next page, 5282, there's a sentence that begins, however, these checks of Alexander do not prevent the operator from continuing with the preparation step. And we cite that page at page 29 of our brief. So from the get-go, Baxter's position has always been Claim 8J requires a system to do exactly what the board ultimately construed it to do, and this distinction seems to be a distraction from the issue. It may be the case that there are embodiments in Alexander where the pharmacist can review interstitial steps, and there may be embodiments where the pharmacist only reviews steps at the end. The fundamental problem with Alexander all along has been, and the board agrees, that it does not disclose a system which does not allow the operator to proceed. That's the fundamental problem of Alexander with regard to Claim Element 8J. And if I could touch briefly on the arguments that BD makes to try to argue that de novo review is appropriate for the Claim 8J elements, I think looking at appendix pages 36 and 37 dispels the notion that the board doesn't give us guidance about what it's doing or why it's doing it. On page 36 of the appendix, it's true that the middle of that page begins with the board summarizing Baxter's argument, but this isn't a situation where Baxter is making five or six different arguments about why Claim Element 8J is not met. At the end of the paragraph that begins on page appendix 36, which occurs on page 37 of the appendix, the board says that Baxter argues that Alexander, quote, does not mandate that the operator is prevented from continuing on with subsequent dosage steps before receiving verification that each step is performed correctly as required by Element 8J. It then quotes the patent owner response, sorry, the surreply, and ultimately says, we find patent owner's argument persuasive. That is the board saying exactly what we were just talking about, this requirement of the system to prohibit the operator from continuing. That argument is the one they found persuasive by Baxter, and that's the opposite argument that BD was making. You don't think that the remote pharmacist telling the processor you're not authorized to continue is not preventing the person from continuing? That's correct, Your Honor, and that gets into a colloquy we had with BD in the briefing about some testimony from their expert, Dr. Young, who testified that indeed in a system like the one Alexander describes, it's possible that drugs could be compounded incorrectly, and they could go out and harm patients or have to be discarded because the system itself does not ensure that each step has been verified before allowing the operator to proceed. So it is true that non-pharmacists can make errors, and they can make errors that are then compounded down the process if they're not using a system like the 579 patent system. And is this not, this is Judge Prost, is that not what KSR was talking about in terms of the inference that even if you're right and there has to be an inference to get you there? I mean, KSR spoke to that explicitly and said you can take account the inferences and creative steps that a person of ordinary skill in the art would employ. So taking every, what you said is there seems to be an inference that if you you have the ability to stop and you can stop just because the language in, you know, in the eight limitation insists on the stop, that that's a difference that makes this patent non-obvious? Well, Your Honor, I agree with your summary of KSR, but the issue that you articulated after that is exactly the issue that we fought about with BD below through many papers and many declarations, depositions, and all of that. And the board ultimately weighed all of that and gave a reasoned opinion as to why the distinction here matters. The distinction in the board's mind under the construction... Well, did the board speak to why even if there is a distinction between Alexander and the patent that you, inferences and creative steps, a person of ordinary skill in the art would employ? To get through that, what you think is the distinction between the two references? I think what the board did, Your Honor, is the board addressed the arguments that BD attempted to use to carry its burden of proof, and then it addressed Baxter's responsive arguments under the KSR framework, and in so doing came to the conclusion that the claim was not obvious. And I think this is a point, this is a place where a point we made in our brief is an important one, which is when BD filed its petition in this case, the only thing it said about claim element 8J was C elements 1E, 1I, 1J, and 1K. And you can see their petition at appendix site page 5044. Now, that's a problem because claim 1, as Your Honor referenced with Mr. Saunders talking about the implications of sort of deciding one way on some issues and one way on the other, the limitation 8J doesn't show up in any form in claim 1. So part of the problem that BD has here and the board grappled with it was they never really explained why they thought what Your Honor just said was the case, because they only referred back to a claim that doesn't have this limitation in it. So the board did what it was supposed to do in referring to and addressing the arguments BD made. In fact, at appendix site 37, the board declines to apply a new argument regarding a reference called DG INFILIPPO that was raised late in the proceedings. The board did what it was supposed to do and adjudicated the petition as filed. If BD had wished to make different arguments, it should have, but unfortunately, we don't see the level of detail Your Honor just set forth in the papers below. So, I'm still puzzled. The remote pharmacist says you're not authorized to proceed. Please stop. That's not the sort of system that's contemplated by the claims here. The system contemplated by the claims here is a system that will ensure that that happens. It has to be a mechanical system as opposed to an individual telling them to stop? Correct. This is an apparatus claim. The board construed it as requiring that the system does not allow something to happen. So there is a systemic sort of mechanical, if you want, prohibition on the operator proceeding in the claims of the 579 patent. Alexander is not that. Alexander is a rudimentary, essentially, it's a way to have pharmacists in big cities overseeing non-pharmacists working remotely because there was a shortage of pharmacists in the early 2000s. So it's a way to use a web camera, which at the time was relatively simple technology, to allow essentially the pharmacist to look over the shoulder of the non-pharmacist. There are no system elements of Alexander. Where does the board view this as opposed to a verbal instruction from the pharmacist? I would point the court to the board's claim construction on Appendix 17, which was not appealed. Which says what? That it has to be mechanical? It says, for the above reasons, we construe Element 8J as requiring that, quote, the system will not allow the operator to proceed to the next step until the prior step has been verified. But it doesn't say it has to be a mechanical impediment, as opposed to instruction from the pharmacist. Your Honor, I would contend that that construction, the object of that sentence, is the system, and the system is a thing that does not allow something to occur. But Alexander discloses verification feedback via some collaboration software, correct? It calls it a real-time collaboration tool. That's true. There's no more detail given than that. And again, this is sort of the... How much more detail would you need? Well, for example, the 579 patent has some screenshots that show what the system looks like to the non-pharmacist operator, and demonstrates how the system ensures that that person does not continue on with the process. In the Alexander world... So are you saying that it's an enablement problem? We can't use the prior art because it's not appropriately enabled? No, not at all. I'm simply saying that Alexander discloses a system whereby a web camera allows a pharmacist to watch what's going on. We don't really know what real-time collaboration tool is, but we certainly don't have a disclosure in Alexander about any system elements that would permit the system to ensure that the non-pharmacist doesn't continue. Well, except that the pharmacist tells them to stop. Right. But in that scenario, the evidence is the non-pharmacist doesn't have to stop. That's where we get again back to the testimony of Dr. Young, who said that in some situations... He'd probably be fine if he didn't stop, wouldn't he? I'm sorry. I missed the first part of the question. He'd probably be disciplined if he didn't stop. Very possibly. Very possibly. But there's also the possibility in the prior art time frame that he ended up doing everything correctly and proceeded without verification because, for example, he had done it a dozen times before, and then the non-pharmacist ultimately says, you did it correctly, but you should have waited for my verification. But again, Alexander is not a system-based disclosure. It doesn't actually prohibit the non-pharmacist from doing anything. This is Judge Clevenger. I have a question, sir. In Alexander, who's giving the ingredients of the prescription to the remote pharmacist? Your Honor, and without trying to get into a treatise on pharmacy practice... I see my time has expired. May I answer the question? Oh, please continue. Okay. Without trying to get into a treatise on pharmacy practice, essentially the Alexander system is a way to create a distributed replication of what would have happened in a real pharmacy. And so in a real pharmacy in the time frame, essentially a label is printed and given to the non-pharmacist, and the label says, I need this volume of this drug. And the non-pharmacist then does whatever the non-pharmacist does to construct that drug formulation. And the pharmacist watches over that person's shoulder. Depending on the kind of drug, sometimes it's mixing a powder with a water, which is very simple. Sometimes it's a sterile pharmaceutical, which is more complex and requires sort of more oversight. You could have cancer drugs. What I was trying to get at is, if the formula for the actual prescription is being supplied to the remote pharmacist, who then does it step-by-step, presumably your patented system could simply refuse to supply a second step if the first step wasn't performed correctly. So the pharmacist wouldn't even know what to do. That's how he would be stopped. I think that's correct. That's one way that he could be stopped. Yes, there are other examples in the specification. For example, if an appropriate barcode is not scanned, the system may not permit the operator to continue by withholding information or withholding sort of the process from the operator. There are several ways describing the patent. What you articulated is absolutely one of them, but others involve, you know, system-based things like barcode scanners or weight scales or image processing verification, that sort of thing. Is it possible in the preparation of the ultimate pharmaceutical product by the remote pharmacist that one step, although performed improperly, could be harmless error? For example, maybe you're adding coloring or you're adding something that's involved in the ingredient, but doesn't affect the pharmacological product. That is absolutely possible. So the step could be harmless error and the person who's watching it from a distance would decide not to stop you? That certainly is possible, but obviously the converse is true. You could have a catastrophic error in some kind of a very sensitive drug, like a cancer treatment drug. An error that may seem harmless could become catastrophic depending on the usage of the drug. Unless there are further questions, I believe I'm out of time. Judge Clevender, did you have any further? No, that's my only question. Okay, thank you. Thank you, Your Honor. Mr. Saunders, you have some rebuttal time left. So just to amplify this point about the pharmacist giving the instruction not to proceed, I mean, this is what the Alexander embodiment is about. It's about supervising the work and verifying it as it is being performed. You're not verifying as it's being performed if someone can just move on to the next step. And you also have, you know, equipment. There's apparatus there. There's not just the telephone, as was pointed out. There is the real-time collaboration tool, talks about providing the feedback via the same collaboration software. So you're talking about an operator who's receiving a message here from the pharmacist, the person who is in control, has a sort of legal authority to be authorizing this in real time as it's being performed, telling them whether that step is verified. And we think that is a straightforward disclosure here of the system claim. And, you know, there is more detail in our... Is there another piece of prior art that seems possible that there could be one out there of some sort of system that has a hard stop? You know, you have to do one thing before you can go to the next route. Were they looking for you to combine it with that kind of reference, too, in order to... Yeah, I think they were looking for an absolute express teaching. And we're not seeing how a creativity doing ordinary inferences and creative steps would read exactly what's being happening here as accomplishing the same thing, as rendering obvious that the idea that you would have this be part of the system. And we think Alexander is disclosing the system here in the real-time collaboration tool. But even if it were just a method, you're just talking about the ordinary creativity of going back and forth from one to another. And I'll just point out that, you know, in Alexander Column 14, there is more discussion about the servers there. At the bottom of it, it talks about custom software. You know, it is not purely the sort of telephonic-based system that's being discussed. Something just really quickly, the issue of those going out... Mr. Saunders and Judge Klobuchar, I think your friend in the room has a creativity issue in play. Well, you know... Right, so I would point you to 1487 through 1488, paragraph 42 of our experts declaration, makes this connection here between Alexander's teaching and the idea that each step would need to be verified before the pharmacy staff member could continue. And the claim 1 versus claim 8... Are you referring to paragraph 45? Oh, I apologize, did I have the wrong paragraph number? I don't know. I'm just looking at 1488, right? I'm just trying to find what you're referring to. Yeah, it's more than one paragraph. Yes, sorry, you're correct. Paragraph 45, the discussion goes and continues, and with your indulgence, may I just respond to Judge Klobuchar's question? So in the claim charts in the petition, claim 1, which doesn't have a system element, what was cited there was the same Alexander disclosure. I mean, I think the best way to think about it is you have more than sufficient evidence in the claim chart for claim 1, and then when you get to claim 8, it cross-references the exact same passage of Alexander that we're talking about, and is backed by this portion of the Young Declaration. It's a pretty obtuse way to raise the most important issue in your case, isn't it? No, because it's not to focus just on the claim charts within the petition, and which has, I mean, has that Alexander disclosure directly in it. You see my point. I just have one last question because I think your time is going away. I'm confused, Mr. Saunders, about what you want, because the main thrust of your brief is you can't figure out what the board was saying, and you want the case to go back for a fulsome explanation. At the same time, you now seem to be arguing that we can clearly reverse flat-out on the verification limitation. I don't, I'm not certain you can have it both ways. What do you really want here? Well, what I think to say is the board summarized what we saw as two arguments from Baxter. We were saying as an initial matter, we can't tell which they're relying on, which would at minimum require remand, but then we proceeded to say, okay, well, let's address both of these arguments, the may-must argument and the reliance on Dr. Britton's testimony. And when you look at both of those explanations, neither of them could support the board's decision. So we're asking for a remand because we think that neither of those could be sufficient. If the court is disagreeing with that, then we would at least need a remand to make sure that that is actually the reasoning that the board itself is endorsing. Wait a minute, this is Judge Proust. I understood it a little different. So now tell me if I'm wrong. I understood you were making kind of two alternative arguments. The first being, the first in blue being you should reverse, but a minimum remand. In gray, you kind of flip the order, as I recall, and start with you should remand it, but argument two was, well, no, you should really reverse it if you don't, you know. Am I misunderstanding your argument? I thought they were sort of like two alternatives, you know, reverse, but at a minimum remand. Am I wrong? No, sorry if I'm creating confusion here. That's correct. We don't think that any of the explanations that the board could have been relying on can support its opinion, so that would be reversal. But at a minimum. Right, right. So I'm still confused. What do you want us to do? We want you to reverse. And at a minimum, if you're not agreeing with us on one of those points, we think that it wouldn't be proper to review those points under a substantial evidence standard when it's not clear which one of them that the board itself was relying on. That's part of the problem with sort of not knowing the precise basis here. But this, I think, is a classic case where this is sufficiently straightforward. And as we've talked about today here, that the Alexander teachings are so on point that this is a classic example of a case where there really wouldn't be anything left for the board to do, where this court can just outright reverse. OK, thank you. Your time has expired. Thank you. We thank both sides and the case is submitted.